IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| WELLS FARGO BANK, N.A., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CV-11-648-D |
| | ) | |
| LOUIS MAYNAHONAH, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**FINDINGS OF FACT, CONCLUSIONS OF LAW,
AND ORDER**

Before the Court is Plaintiff's Motion for Preliminary Injunction [Doc. No. 34], filed

pursuant to Fed. R. Civ. P. 65. The Court conducted a hearing on August 18, 2011, at which

Plaintiff Wells Fargo Bank, N.A. ("Wells Fargo") appeared through local counsel, Phillip Whaley,

and through counsel admitted *pro hac vice*, Jerome Miranowski and Michael Krauss; Defendants

appeared through counsel Jon E. Brightmire and Bryan Nowlin for members of the Apache Business

Committee, and Richard Grellner and Amber Bighorse for members of the Apache Gaming

Commission and Mr. Grellner as its appointed hearing officer.[1] The Court received the testimony

of witnesses, admitted documentary evidence offered by the parties, and heard the arguments of

counsel. Upon consideration of these materials, as well as the motion papers and briefs, the Court

now issues its ruling on Plaintiff's request for a preliminary injunction.

I.

Background

On July 22, 2011, the Court issued a temporary restraining order substantially similar to the

preliminary injunction now sought. By that Order, the Court prohibited Defendants Gene Flute,

---

[1] An attorney for TGS Andadarko, LLC, which has filed a motion to intervene, was also present.

Ronald Ahtone, Jr., Austin Klinekole and Richard J. Grellner, as members or officers of the Apache Gaming Commission ("AGC") from conducting any hearing, issuing any order, making any determination, or taking any official action with respect to a pending proceeding against Plaintiff and TGS Anadarko, LLC ("TGS"), which is currently a nonparty. Familiarity with the July 22 Order [Doc. No. 56], and the procedural history set forth therein, is assumed. As pertinent here, Plaintiff accuses the Apache Tribe of Oklahoma (the "Tribe") of acting contrary to its contractual obligations under a gaming equipment lease that contains an arbitration agreement. Plaintiff asks the Court to preserve for decision by neutral arbitrators the question of whether the parties' dispute is arbitrable and, if so, whether a breach of the lease has occurred. Defendants deny that the Tribe's regulatory authority over gaming activities in Indian country can be affected by a contract with private parties or that a dispute involving tribal and federal gaming laws is subject to arbitration. Because the parties' arguments raise complex issues of federal, state and tribal law, the Court entered the temporary restraining order to preserve the *status quo* and permit a more deliberate, better informed decision of whether the AGC should be enjoined from further proceedings.

## II.

### Preliminary Injunction Standards

The standard for issuance of a preliminary injunction is familiar. "To obtain a preliminary injunction, a plaintiff must show: '(1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public's interest.'" *Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140, 1154 (10th Cir. 2011) (quoting *Chamber of Commerce v. Edmondson*, 594 F.3d 742, 764 (10th Cir. 2010)); *see Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). A preliminary injunction is an extraordinary remedy that is "designed to

'preserve the relative positions of the parties until a trial on the merits can be held.'" *Westar Energy, Inc. v. Lake*, 552 F.3d 1215, 1224 (10th Cir. 2009) (quoting *University of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). In this federal circuit, courts generally apply a modified standard under which, if a movant establishes that other requirements tip strongly in his favor, the movant "may meet the requirement for showing success on the merits by showing that questions going to the merits are so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation." *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1255-56 (10th Cir. 2003); *see O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 976 (10th Cir. 2004) (en banc), *aff'd sub nom.*, 546 U.S. 418 (2006).

Contrary to this general rule, three types of preliminary injunctions are "historically disfavored" and require the movant to satisfy a heightened burden and make a strong showing that all four factors are met. *See O Centro*, 389 F.3d at 975; *see also Attorney General v. Tyson Foods, Inc.*, 565 F.3d 769, 776 (10th Cir. 2009); *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009). Defendants contend that one disfavored category is implicated in this case, that is, "preliminary injunctions granting the moving party all the relief it could recover at the conclusion of a full trial on the merits." *Westar Energy*, 552 F.3d at 1224, *O'Centro*, 389 F.3d at 975. Defendants also rely on a fourth category approved by the Tenth Circuit in *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003), for preliminary injunctions that seek "to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme." *See also Nova Health Sys. v. Edmondson*, 460 F.3d 1295, 1298 n.6 (10th Cir. 2006). Defendants argue that Plaintiff is seeking to restrain regulatory action taken by a tribal government in the public interest.

The Court is not persuaded by these arguments. The requested preliminary injunction would not afford Plaintiff full relief, as the Amended Complaint also seeks relief against members and officers of the Apache Business Committee and seeks a declaration of rights regarding matters other than the pending tribal proceeding. Further, as discussed below, the Court does not intend to restrain regulatory action by the AGC within the scope of its legitimate authority but, instead, intends to limit the exercise of the Court's jurisdiction to the federal questions presented by the Amended Complaint.

By separate order, the Court has denied a motion by Defendants to dismiss the Amended Complaint and, in so doing, has found that federal subject matter jurisdiction exists to address allegations that Defendants are violating federal law. The Court has further found that tribal exhaustion should not be required because "the issues framed by the Amended Complaint and Defendants' contentions present federal questions that lie beyond the jurisdiction of the Gaming Commission, or any other tribal entity, to decide." *See* Order of Sept. 2, 2011 [Doc. No. 74] at 8. In the Court's view, the enforceability of the Tribe's contractual commitments to arbitrate disputes is an issue of federal law and is not a matter within the scope of the AGC's regulatory authority.

However, there is no question that the AGC is invested by federal, state, and tribal laws with regulatory authority over tribal gaming within Indian country. The tribal gaming activities at issue in this case are governed by the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701-19, and a federally-approved tribal-state gaming compact, which determines the respective regulatory authority of state and tribal governments over Class III gaming conducted on Indian lands within state boundaries.[2] As discussed below, the AGC was established by a tribal gaming ordinance,

---

[2] IGRA establishes three categories of gaming activity; Class III encompasses gambling activities such as "slot machines, casino games, banking card games, dog racing, and lotteries." *See Seminole Tribe v. Florida*, 517 U.S. 44, 48 (1996); *see also* 25 U.S.C. § 2703(7)(B), (8). Only Class III gaming requires a

which authorizes the AGC to regulate tribal gaming operations and to provide oversight of such operations to ensure compliance with applicable laws. The injunctive relief sought by Plaintiff is overbroad to the extent it would impinge on the AGC's legitimate regulatory authority to determine matters within its jurisdiction. TGS voluntarily sought, and obtained, a gaming license from the AGC, and TGS's activities as a licensed vendor are clearly subject to the AGC's regulation and oversight. This Court is not authorized to decide, and should abstain from deciding, any issues that fall within the AGC's legitimate regulatory authority.[3]

Viewed through the prism of federal jurisdiction, the preliminary injunctive relief requested by Plaintiff does not fall into any disfavored category, and thus, the modified standard applies.[4] Plaintiff seeks to preserve the *status quo* and to prohibit the AGC from taking action that would be contrary to the Tribe's agreement to arbitrate contract-related disputes and would affect contractual rights.[5] Notably, at this point in the case, no challenge has been made to the validity of the arbitration agreement at issue. Rather, Defendants contend the agreement does not encompass, or is unenforceable as applied to, a regulatory matter. However, the Court here considers only whether a preliminary injunction should issue to prevent the AGC from acting *beyond* the scope of its regulatory authority.

---

tribal-state compact. *See* 25 U.S.C. § 2710(d)(1).

[3] For example, one issue set for hearing by the AGC is whether TGS is suitable for licensing.

[4] However, as discussed *infra* in Conclusions of Law, the Court's ruling on Plaintiff's Motion would be unchanged if the heightened standard applied.

[5] The "status quo" is the last peaceable or uncontested status between the parties prior to the conflict at issue. *Schrier v. University of Colorado*, 427 F.3d 1253, 1260 (10th Cir. 2005). The Court has previously found that the last peaceable or uncontested status between Plaintiff and the AGC ended in April, 2011, when the AGC first raised allegations now at issue in the pending tribal proceeding. *See* July 22 Order [Doc. No. 56] at 3. The Court adheres to that determination.

III.

Findings of Fact

1.  The Tribe and the State of Oklahoma entered into a Tribal Gaming Compact in 2005, allowing the Tribe to engage in Class III gaming on its lands within the State. Plaintiff's Hearing Exhibit ("P. H. Ex.") 3.[6] The Tribal Gaming Compact recognizes the AGC as the Tribal Compliance Agency with authority to carry out the Tribe's regulatory and oversight responsibilities under the Compact. *Id.* at Part 3, ¶ 26. The AGC's oversight and responsibilities focus primarily on the licensing process for employees of gaming facilities and certain other individuals and entities providing specified goods or services to a tribal gaming enterprise. *Id.* Under the Compact, federally regulated financial institutions, such as Plaintiff Wells Fargo, which provide financing are exempt from licensing requirements. *Id.* at Part 10, ¶ C. 4.

2.  The Apache Tribe enacted, and federal authorities approved, its Tribal Gaming Ordinance, which in turn empowered the AGC to put in place regulations in connection with its oversight responsibilities. P. H. Ex. 1, § 108.

3.  The AGC enacted the Apache Gaming Commission Policy and Procedure Manual ("Manual") setting forth regulations, policies, and procedures regarding gaming in tribal facilities. Defendants' Hearing Exhibit ("D. H. Ex.") 11.[7]

4.  The Manual as submitted addresses vendor licensing, and the AGC's ability to impose fines or penalties for noncompliance with regulatory provisions, in several places. A full reading of these provisions reflects that the AGC, in connection with its regulatory authority, may impose

---

[6] Many of the same exhibits were submitted by both parties. The Court has generally attempted to cite to the most legible copy submitted.

[7] It is unclear whether the full Manual was provided; D. H. Ex. 11 appears to be incomplete.

civil fines and penalties upon "any licensee" determined to have "violated any of these regulations . . . ." Further, the licensee "shall be required to pay any penalty before the license . . . is reinstated." Although one applicable section of the Manual sets per-day limits for such "one time assessments" as "$500.00 up to $5,000.00," other provisions do not contain a limitation. However, it is clear from the applicable provisions, and the Manual in general, that such penalties and fines are intended to be used to compel compliance by a licensee. *See* D. H. Ex. 11, pp. 14 of 71; 29-30 of 71; and 54 of 71.

5. On or about June 23, 2008, the Tribe and Wells Fargo entered into a Loan Agreement in order to finance the further development and improvement of casino facilities by the Tribe. The Loan Agreement required Wells Fargo to lend the Tribe $4,365,000. P. H. Ex. 8.

6. The Loan Agreement contains a broad arbitration provision requiring, upon demand of a party, any dispute under the Loan Agreement and related documents to be submitted to binding arbitration. The Loan Agreement also contains an express waiver of sovereign immunity by the Tribe to allow for arbitration or other legal action brought against the Tribe. *Id.* at §§ 11.24 and 11.27.  7. In the event of an arbitration award, the Loan Agreement provides that judgment upon such award "may be entered in any court having jurisdiction (including any Tribal Court which now exists or which may become effective after the date of [the Loan Agreement]). . . ." *Id.* at § 11.24(b). The term "Tribal Court" is defined in the Loan Agreement as "any tribal court of the Borrower." *Id.* at § 1.1. At the time of the execution of the Loan Agreement, the Tribe acknowledged that it did not then have a tribal court. *Id.* at § 4.4. The Chairman of the Tribe, Louis Maynahonah, testified at the preliminary injunction hearing that the Tribe still has no court system.

8. Although the Loan Agreement references potential action by a tribal court on an arbitration award, it goes on to state that, "[i]n any event, no action may be brought in any Tribal Court without the prior written consent of [Wells Fargo]." *Id.* at § 11.27(e).

9. In connection with the Loan Agreement the Tribe was required, as a condition precedent to closing, to enact an Arbitration Ordinance in a form acceptable to Wells Fargo. The Tribe enacted the Arbitration Ordinance effective as of the date of closing on the Loan Agreement. P. H. Ex. 57. The Arbitration Ordinance provides that, as used therein, "The term 'Tribal Forum' shall mean (a) if there is no tribal court of the Tribe, the Business Committee or (b) any tribal court established by the Tribe." The Arbitration Ordinance further provides, *inter alia*, that a party to an arbitration may make an application to the Tribal Forum for an order confirming an arbitration award. The ordinance goes on to state, however, that the Tribal Forum may not review or modify an arbitration award, but may only confirm the same "strictly as provided by the arbitrator(s)." The ordinance also provides that, in connection with arbitrated disputes in which the Tribe is a party, the Tribal Forum may enforce an award unless its jurisdiction is expressly prohibited by the underlying contract. *Id.* at §§ 7 and 9.

10. Contemporaneous with the execution of the Loan Agreement, Wells Fargo entered into a Credit Agreement with TGS Anadarko, LLC, ("TGS") to loan up to $3,500,000 to allow TGS to provide gaming machines to the Tribe under a master lease (the "Equipment Lease") between TGS (as assignee of another entity) and the Tribe. P. H. Ex. 9.

11. The Equipment Lease includes a broad arbitration provision for any claim or dispute related to the lease, and further provides that the question whether or not a particular dispute is arbitrable is itself subject to binding arbitration. P. H. 20 A § 22. The Equipment Lease also contains a waiver of sovereign immunity, as well as the doctrine of exhaustion of tribal remedies.

*Id.* at § 22(f) and (g). The arbitration provision and waivers were reaffirmed by the Tribe in connection with the assignment of the lease to TGS. P. H. Ex. 20 D.

12. As part of its financing agreement with TGS, Wells Fargo took an assignment of the Equipment Lease as additional security under the Credit Agreement between Wells Fargo and TGS. P. H. Ex. 9, § 1.01 ("'Assignment of Rents' shall mean the Assignment of Equipment Lease and Rents to be executed concurrently herewith by Borrower as Assignor for the benefit of Lender or Assignee as additional security for the Loan. . . ."); § 3.03 ("The Security Documentation duly executed by Borrower . . . consisting of the following: . . . (c) Assignment of Rents;").

13. The Assignment of Equipment Lease and Rents between Wells Fargo and TGS provides that, barring default, TGS reserves "a revocable license to collect the rents and to possess, use and enjoy the Lease Agreement and other Assigned Interests." P. H. Ex. 55, § 2. The Assignment further requires TGS to secure from the Tribe an estoppel agreement approving the assignment to Wells Fargo, allowing Wells Fargo to enforce the Equipment Lease, and expressly extending to Wells Fargo the arbitration provision and waiver of sovereign immunity within the Equipment Lease. *Id.* at § 10.

14. In connection with the closing of the various transactions, on June 23, 2008, the Tribe provided to Wells Fargo an "Estoppel Certificate," along with a tribal resolution adopting the same. P. H. Ex. 11.

15. The Estoppel Certificate acknowledges the assignment of the Equipment Lease to Wells Fargo "as security" for obligations of TGS to Wells Fargo. The Estoppel Certificate further recognizes that Wells Fargo, as assignee, would be entitled to the benefits of the lease but would not be "subject to any of the burdens or obligations of [TGS] under the [lease] or, in connection therewith. . . ." The Estoppel Certificate goes on to state that the arbitration provision and waiver

of sovereign immunity within the Equipment Lease inure to the benefit of Wells Fargo as assignee of the lease. In the Estoppel Certificate the Tribe expressly reaffirms its submission to the jurisdiction of Oklahoma state courts and the United States District Court for the Western District of Oklahoma in connection with disputes related to the lease, the Estoppel Certificate, or the enforcement of an arbitration award. Finally, the Estoppel Certificate allows for an action in "any tribal court having jurisdiction" for the purpose of entering judgment on or enforcing an arbitration award, provided, however, that "no action may be brought in any tribal court without the prior written consent of [Wells Fargo]." P. H. Ex. 11.

16. Prior to the closing of the various funding transactions Wells Fargo sought confirmation from the AGC that it would not be required to obtain a vendor license by virtue of the contemplated transactions, and specifically the assignment of the Equipment Lease. P. H. Ex. 4.

17. On June 23, 2008, the Chairman of the AGC at the time, Gene Bigsoldier, stated in a letter to Wells Fargo that it met the requirements for the licensing exemption regarding regulated financial institutions set forth in the Tribal Gaming Compact. P. H. Ex. 7. The AGC stated: "[T]he Apache Gaming Commission finds that Wells Fargo Bank is exempted from licensing specifically for the loan transaction dated on or about June 23, 2008 between Wells Fargo and . . . TGS . . . ." The AGC went on to state: "With respect to that certain Credit Agreement, and related documents, dated on or about June 23, 2008 . . . among TGS . . . as Borrower, and Wells Fargo . . . as Lender, the foregoing exemption shall remain in full force and effect notwithstanding any amendment, restatement, extension, refinancing, refunding, supplement or other modification of the Credit Agreement or the credit facilities provided for therein." *Id.*

18. The Tribe is governed by its Tribal Council, which consists of all voting-age members, but its activities are conducted by an elected Business Committee. The composition of the Tribe's

Business Committee changed after tribal elections in 2010. The former Business Committee had approved and executed the transaction documents and related documents regarding the Loan Agreement between the Tribe and Wells Fargo, as well as the Equipment Lease. The Business Committee as composed following the 2010 elections instituted a complaint on behalf of the Tribe in this Court against multiple defendants, including Wells Fargo, challenging, *inter alia*, the enforceability of the Loan Agreement.

19. Wells Fargo made a demand for arbitration regarding the dispute related to the Loan Agreement, and the Tribe voluntarily dismissed Wells Fargo from that litigation in favor of arbitration.

20. The Tribe and Wells Fargo proceeded to arbitration in May 2011 before retired United States District Judge Tom Brett. P. H. Ex. 30. Wells Fargo alleged that the Tribe had breached the Loan Agreement, and sought approximately $2.7 million in damages; the Tribe asserted that the loan documents were unenforceable, alleged wrongful conduct in connection with TGS and the Equipment Lease, and sought $39 million in damages. *Id.* On May 23, 2011 Judge Brett issued his arbitration decision. *Id.* In his nineteen page decision Judge Brett concluded, *inter alia,* that the Tribe had expressly waived its sovereign immunity with respect to all claims and defenses at issue; the Loan Agreement and related documents are valid and enforceable against the Tribe; the Loan Agreement is not a management contract; and the Tribe materially breached the Loan Agreement. Judge Brett awarded damages in the amount of $2,751,160.20 in favor of Wells Fargo, and found in favor of Wells Fargo on the Tribe's counterclaim. *Id.* at p. 17-18.

21. Just prior to the arbitration proceeding, on April 26, 2011, the Tribe's Business Committee – upon the advice of legal counsel – unanimously adopted the Resolution Establishing Tribal Forum for Arbitration ("Tribal Forum Resolution"). P. H. Ex. 25. The Tribal Forum

Resolution makes reference to the Arbitration Ordinance (*see* P. H. Ex. 57) required as a condition precedent to closing the loan set forth in the Loan Agreement. The Tribal Forum Resolution purports to create the "Tribal Forum" referred to in the Arbitration Ordinance (composed of the Business Committee), and further provide for its jurisdiction and powers. P. H. Ex. 25. However, the Arbitration Ordinance was itself previously adopted by tribal resolution (*see* P. H. Ex. 56), and the Arbitration Ordinance also established the Apache Business Committee as the "Tribal Forum" in the absence of a tribal court. P. H. Ex. 57, § 1(b). Moreover, the Arbitration Ordinance likewise provided for the jurisdiction and powers of such Tribal Forum, expressly limiting it to the confirmation of arbitration awards ("An arbitration award shall not be subject to review or modification by the Tribal Forum, but shall be confirmed strictly as provided by the arbitrator(s)."). *Id.* at (c).

22. The Tribal Forum Resolution borrowed liberally from the text of the earlier Arbitration Ordinance, but sharply diverged from the ordinance by purporting to provide to the Business Committee (acting as Tribal Forum) broad powers of review and modification of arbitration awards. Indeed, the resolution allows the Tribal Forum to "decline to enforce any arbitration award or alternatively order a re-hearing" under circumstances set forth in the resolution.[8] P. H. Ex. 25,

---

[8] Such action could be taken if the Tribal Forum finds that:
"(1)    The award was procured by fraud, corruption, or undue influence
  (2)    There is evidence of partiality on the part of the arbitrator(s)
  (3)    A party concealed evidence or failed to provide d [sic] relevant discovery (if discovery is contemplated by the arbitration agreement) in a timely fashion so as to prejudice the rights of the opposing party
  (4)    The arbitrator abused discretion in refusing to postpone the hearing upon good cause, or in refusing to hear evidence material to the case or controversy; or of any other misconduct by which the rights of any party have been prejudiced
  (5)    The arbitrator(s) committed a manifest error of law or fact in reaching the award as set forth in any findings of fact or conclusions of law;
  (6)    The arbitrator(s) exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter was not

§ 1(d).  The resolution further provides that no appeal may be taken from a Tribal Forum order modifying or correcting an arbitration award.  *Id.* at § 2(b).

23.  The Arbitration Ordinance contains a specific jurisdiction provision applicable to matters in which the Tribe itself is a party.  That provision, *inter alia*, expressly limits the jurisdiction of the Tribal Forum to the enforcement of awards, but also allows for the preclusion on such jurisdiction where prohibited by the underlying agreement which provides for the right to arbitrate.  P. H. Ex. 57, § 9(a).

24.  The corresponding Tribal Forum Resolution provision on jurisdiction is almost identical to Section 9 in the Arbitration Ordinance, except it adds the words "or decline to enforce" an arbitration award to the jurisdictional grant.  Importantly, however, the provision preserves the limitation on the jurisdiction of the forum where the underlying contract "expressly prohibit[s] the Tribal Forum from exercising jurisdiction thereunder."  P. H. Ex. 25, § 4(a).

25.  During the hearing, Chairman Maynahonah testified that the Tribal Forum Resolution was adopted just prior to the May 2011 arbitration hearing in order to protect the Tribe from potential liability, including that which might result from the arbitration proceeding.  In response to questioning by Plaintiff's counsel regarding the timing of the resolution, Chairman Maynahonah stated "we were going to arbitration and there's no telling how things might turn out."

26.  Also on April 26, 2011 the Business Committee unanimously adopted the Resolution of the Apache Tribe of Oklahoma stating Tribal law as to penalties for unlicensed casino vendors, providing that Apache tribal law includes the "remedy of disgorgement," and authorizing the AGC to "seek enforcement of disgorgement, as well as any other remedy at law or equity, in any tribal,

made".  P. H. Ex. 25, § 1(d).

state, or federal court of competent jurisdiction." P. H. Ex. 24. The purpose of the resolution was purportedly to fill a gap in the Tribal Gaming Compact regarding "remedies for payments made to a casino vendor who was without a license at the time of the payments, or who improperly conducted business through the auspices of a license belonging to another. . . ." *Id.*

27. Chairman Maynahonah also testified during the hearing that the disgorgement resolution was adopted – upon the advice of legal counsel – in order to protect the tribe from litigation and potential liability.

28. The Loan Agreement sought to preclude the Tribe from adopting any tribal law impairing any right or remedy of Wells Fargo under the agreement without its consent. P. H. Ex. 8, § 6.17. Further, the Loan Agreement expressly sought to protect Wells Fargo from impairment of its rights through the Tribe's amendment of material documents, including the Arbitration Ordinance, without the consent of Wells Fargo. *Id.* at § 6.14; § 1.1 (defining "Material Document").

29. Similarly, the Equipment Lease contains a provision seeking to protect the lessor (TGS by assignment) from any after-the-fact adoption by the Tribe of any law or requirement (expressly including any law or requirement relating to licensing of a gaming device owner) impairing the rights or remedies of the lessor. P. H. Ex. 20 A, § 24.

30. Following the issuance of the arbitration decision and award by Judge Brett, the Tribe on June 1, 2011 filed a request that the Business Committee – in its capacity as Tribal Forum – vacate the arbitration award. P. H. Ex. 58. The motion sought vacation of the arbitration decision and award in light of the Tribe's contention that the Loan Agreement, including its arbitration provision, is an illegal management contract – the precise assertion which Judge Brett rejected in his arbitration decision. Judge Brett, the Tribe contended in its motion, committed "a manifest error

of law" in ruling otherwise. Chairman Maynahonah promptly issued an order from the Business Committee, acting as the Tribal Forum, assuming jurisdiction, ordering Wells Fargo to respond, and setting the matter for hearing.

31. On June 8, 2011, Wells Fargo filed a complaint in this Court, and asserted a motion for a temporary restraining order ("TRO") and preliminary injunction to preclude the Tribal Forum from exercising jurisdiction [Doc. No.14].

32. The Court set the TRO motion for hearing on June 14, 2011, and directed Wells Fargo to provide notice to the Tribe [Doc. No. 15]. On June 13, 2011, the Tribe filed its response to the motion for TRO and for preliminary injunction [Doc. No. 20]. At the TRO hearing on June 14, 2011, counsel for the Tribe (the same counsel representing the members of the Business Committee currently before the Court) presented to the Court a "Final Order" issued by the Tribal Forum on June 13, 2011, purporting to vacate the arbitration award – the very action Wells Fargo sought to temporarily enjoin.[9] *See* P.H.Ex. 29; *see also* Order [Doc. No. 24].

33. Around the time that the Tribal Forum sought to assert jurisdiction over Wells Fargo, the AGC attempted to assert regulatory jurisdiction over Wells Fargo and TGS. On April 13, 2011, the Chairman of the AGC, Gene Flute, sent a letter to Wells Fargo and TGS providing notice that, by virtue of the June 2008 Assignment of Equipment Lease and Rents, "Wells Fargo is acting in capacity as a gaming vendor and owner of Class III gaming machines within the Tribe's Silver Buffalo Casino and has acted in that capacity since at least June 23, 2008." P. H. Ex. 23. The letter went on to state that Wells Fargo was required to obtain a license from the AGC "prior to

_____

[9] The parties agreed at that time that the Tribal Forum's action rendered the motion for TRO moot. *See* Order, Doc. No. 24. The Court observes, however, that the conduct of the Tribe – presumably advanced with the assistance of, or at least the knowledge of, its counsel, smacks of the type of "race against the law" noted critically by the United States Supreme Court in *Jones v. Securities and Exchange Commission*, 298 U. S. 1 (1936).

implementation of the lease," and that Wells Fargo is not exempted by the Tribal Gaming Compact from licensing requirements. These positions are directly contrary to the Tribe's express representations at the time of the closing of the Loan Agreement that Wells Fargo was entitled to the licensing exemption under the Tribal Gaming Compact, and that Wells Fargo would not be subject to the performance duties or obligations of TGS under the Equipment Lease. *See* P. H. Ex. 7 and 11, and ¶¶ 14-17, *supra*. The AGC chairman's letter stated in conclusion:

> It is apparent, that the Tribe should not have made payments to TGS as the owner of the gaming machines was Wells Fargo which never requested nor obtained a gaming license. The AGC is conducting an investigation regarding this matter and may determine that disgorgement of revenues paid is the appropriate remedy. We understand that the total amount paid to TGS for the benefit of Wells Fargo is $2,130,352.00. We will make you aware of our findings at the soonest possible opportunity.

P. H. Ex. 21.

34. On May 5, 2011, the AGC Hearing Officer, Richard Grellner, a defendant herein, notified counsel for Wells Fargo and TGS that the AGC would hold a hearing on May 17, 2011, for the purpose of determining "whether Wells Fargo and/or TGS have violated the licensing requirements of the AGC in connection with the ownership and leasing of the gaming equipment to the Apache Tribe for the Silver Buffalo Casino, and if so to determine whether any civil penalty should be imposed against Wells Fargo and/or TGS under Apache law for violation of its licensing requirements. . . ." P. H. Ex. 27.

35. The issues raised in the April 13 letter from the AGC, along with other issues relating to the Equipment Lease, became the subject of a demand for arbitration asserted by Wells Fargo and TGS on May 17, 2011. P. H. Ex. 28. In light of the arbitration demand, and Wells Fargo's

agreement to refrain from immediately taking legal action to compel arbitration, the AGC postponed its hearing. P. H. Ex. 32.[10]

36. On June 19, 2011, the Tribe filed its arbitration answering statement asserting, *inter alia*, that the AGC's authority to regulate gaming through the licensing process cannot be contractually delegated to an arbitrator, and claiming the Equipment Lease is an unapproved management contract which is void as a matter of law. P. H. Ex. 35. The latter assertion was made by the Tribe despite an Opinion Memorandum by the AGC on May 29, 2008, concluding that the Equipment Lease is not a management agreement requiring approval by the National Indian Gaming Commission. P. H. Ex. 5.

37. On June 24, 2011, the Tribe filed with the AGC a Petition for License Review "regarding vendors TGS and Wells Fargo . . . ." P. H. Ex. 37. In the Petition the Tribe asked the AGC to conduct a hearing on five issues, and if violations were found, to "enter a civil penalty" which, the Tribe alleged, should include "complete disgorgement" of all gaming revenues improperly received. *Id.*

38. On July 14, 2011, the AGC entered an order setting for hearing the issues set forth in the Tribe's Petition for License Review. The order identified the issues to be determined as:

> 1. Whether TGS improperly allowed Wells Fargo to use benefit of its gaming license pursuant to an Assignment of the Gaming Lease dated June 23, 2008 between TGS and Wells Fargo.
>
> 2. Whether TGS provided state compact-compliant gaming machines pursuant to the Gaming Equipment Lease effective January 1, 2009.
>
> 3. Whether TGS made prior report of the movement of machines pursuant to the federal Johnson Act.

---

[10] Wells Fargo and TGS later filed an Amended Statement of Claim in the arbitration. P. H. Ex. 41.

4.  Whether a declination letter regarding sole proprietary interest or management contract status was obtained from the NIGC at any time prior to the effective date of the Gaming Equipment Lease.

5.  Whether TGS or its principal Robert J. Medeiros is suitable to obtain a license for the limited purpose of obtaining possession to slot machines provided under the Gaming Equipment Lease effective January 1, 2009 that remain on the Tribe's trust land.

P. H. Ex. 40.  The hearing was set for July 22, 2011.  *Id*.  The order directed TGS to attend the hearing, and directed Wells Fargo to respond to certain inquiries by the AGC, reserving a potential further hearing specifically directed to Wells Fargo.  *Id.*

39.  On July 5, 2011, Wells Fargo filed an Amended Complaint herein, expanding its original allegations to include claims in connection with the AGC's assertion of jurisdiction over it and TGS, and seeking injunctive relief to prevent such action by the AGC.[11]  Doc. No. 25.

40.  On July 15, 2011, Wells Fargo again filed a motion for TRO and preliminary injunction, this time seeking to enjoin further action by the AGC pursuant to the order previously entered by the AGC (P. H. Ex. 40) setting various issues for hearing on July 22, 2011.  Doc. No. 34.

41.  A hearing on Wells Fargo's motion for TRO was held on July 21, 2011.  At the hearing counsel for the Business Committee member defendants, Mr. Nowlin, presented argument for all defendants.[12]  Counsel initially maintained that the AGC would not address during its contemplated hearing issues leading to determinations affecting Wells Fargo, but would instead adjudicate matters going to TGS, and would not require Wells Fargo to be present.  That led to the following exchange between Court and counsel:

---

[11]  The Amended Complaint also substituted the individual members of the Business Committee and the AGC as defendants.

[12]  Mr. Nowlin's argument was supplemented by argument from Mr. Grellner on his own behalf and on behalf of the AGC defendants.

THE COURT: Well, but whether Wells Fargo is being required to be present is just - - it just begs the question. I mean, if you're deciding issues that are going to have some type of preclusive effect on Wells Fargo's ability to assert its rights, whether it's being required to be there or not, and you're affecting the interest of Wells Fargo is - -

MR. NOWLIN: I understand the point, your Honor. And I would argue that the Gaming Commission - - the tribe, as the person who has submitted the petition for license review, recognizes that it will not - - any determinations as to TGS will not be preclusive as to Wells Fargo. I'm happy to state that on the record and, in fact, just have.

THE COURT: So if you all determine that TGS has improperly allowed Wells Fargo to utilize its license, in your words, then whenever the day comes when you require Wells Fargo to show up before the commission, are you going to re-litigate that entire issue and redetermine it?

MR. NOWLIN: According to what I just said, your Honor, that would be the case. And I believe that's the position the Gaming Commission has taken.

THE COURT: That, if not literally impossible, you know, or unlikely, I should say, it's practically unlikely. Would you agree with that?

MR. NOWLIN: I understand that the same fact finders would be making the same decisions, potentially, upon the same evidence.

P. H. Ex. 46, pp. 35-36.

42. The Court issued its TRO on July 22, 2011, and set the matter for further hearing on the request for preliminary injunction. Doc. No. 56.

43. During the hearing on the motion for preliminary injunction, Mr. Grellner, a defendant herein and the AGC hearing officer, testified that the TGS license expired in 2009, and TGS requested license renewal that year. For reasons he was not aware of, TGS was apparently allowed to continue to conduct business as a vendor and receive payments from the Tribe until May or June of 2010. Later in the summer of 2010 – in July or August according to Mr. Grellner – TGS was no longer allowed to conduct business with the Tribe as a gaming vendor and the Tribe cut off payments to TGS. Mr. Grellner confirmed that, by the time the AGC sent the April 13, 2011 letter raising regulatory issues regarding TGS and Wells Fargo, TGS had not been functioning as a vendor for nearly a year. Mr. Grellner further confirmed that, under the circumstances relating to TGS, the AGC could simply decline to reissue a license if it concludes that TGS has not properly supported its renewal application or otherwise has failed to respond to requests for information from the AGC.

44. It is not disputed that, from the summer of 2009 until April 13, 2011, the AGC took no formal action regarding the application for license renewal submitted by TGS.

IV.

Conclusions of Law

In light of the foregoing findings of fact and the principles of law governing preliminary injunctions, the Court reaches the following conclusions.

A.     Likelihood of Irreparable Injury

The court of appeals has noted that "[b]ecause a showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction, the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered." *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1261 (10th Cir. 2004) (internal quotation omitted). A movant "satisfies the irreparable harm

requirement by demonstrating 'a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages.'" *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009) (quoting *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir.2003)). Although the concept of irreparable harm is not easily defined, the movant must identify an injury that is "both certain, great, actual and not theoretical." *See Heideman*, 348 F. 3d at 1189; *accord Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001).

In this case, the Court finds that Plaintiff has made a sufficient showing of irreparable harm if the AGC goes forward with a proceeding to decide the issues raised by the Tribe's Petition for License Review. It is undisputed that the Equipment Lease executed by the Tribe contains a broadly worded arbitration agreement that, by its terms, requires any claim related directly or indirectly to the lease to be decided by binding arbitration administered by the American Arbitration Association. The agreement expressly reserves for decision by arbitrators the question of whether a dispute is arbitrable. The Tribe makes allegations in its Petition for License Review regarding the nature and effectiveness of the Assignment and the Equipment Lease; these issues clearly relate to the Equipment Lease and fall within its arbitration provision. Plaintiff's bargained-for right to proceed expeditiously through the arbitral process, and to have the arbitrability question decided by neutral arbitrators, may be irretrievably lost or impaired if the AGC is permitted to determine issues integral to the contractual dispute under the guise of exercising its regulatory power. Further, the civil penalties sought by the Tribe and purportedly available to the AGC may seriously impact Plaintiff's contractual rights and remedies. In short, the Court finds that here, as in *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dutton*, 844 F.2d 726, 728 (10th Cir. 1988), extraordinary relief is warranted "to preserve the prearbitration status quo."

The Court finds an additional showing of irreparable harm based on the fact that, if the AGC is allowed to press forward with its proceeding, Plaintiff will be compelled to expend resources and effort in litigating before the AGC issues over which the AGC likely lacks jurisdiction. *See*, *e.g.*, *Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140, 1156-58 (10th Cir. 2011) (trial court issued preliminary injunction due to significant risk of irreparable harm because movant would be forced to expend unnecessary time, money, and effort litigating before tribal court which likely did not have jurisdiction).[13] Here, although TGS has not done business with the Tribe as a gaming vendor since the summer of 2010, the AGC seeks to go far beyond any determination regarding whether to renew TGS's license, or any action necessary to compel TGS to comply with tribal licensing regulations, and *adjudicate* issues related to the nature and effect of contract documents and determine claims for disgorgement of millions of dollars – claims beyond the reasonable pale of regulatory civil penalties to compel compliance by a regulated party. This assertion of general adjudicatory jurisdiction by the AGC is cast against the backdrop of carefully crafted provisions within the Loan Agreement, Equipment Lease, Arbitration Ordinance, and Estoppel Certificate – expressly consented to by the Tribe's previous Business Committee – designed to avoid such an exercise of jurisdiction. Further, Plaintiff's expenditure of time, money, and resources likely could not be recouped later, even if Plaintiff prevails on the merits in this case and even if Plaintiff obtains an arbitral ruling that the Petition for License Review presents an arbitrable dispute. In short, the Court finds that without an injunction Plaintiff stands to suffer both tangible and intangible losses that likely cannot be compensated in money damages.

---

[13] In affirming the trial court's decision, the court of appeals declined to reach the sufficiency of this basis for the district court's finding of irreparable harm in light of other irreparable economic injury.

For these reasons, the Court finds that Plaintiff has shown a likelihood of irreparable harm if a preliminary injunction does not issue.

B.    Balance of Interests

The Court further finds that the potential injury to Plaintiff if the AGC is allowed to proceed outweighs any harm that Defendants may suffer from the issuance of a preliminary injunction. Defendants argue that the requested injunction offends tribal sovereignty and is contrary to a strong federal policy of promoting tribal self-government and self-determination. While sensitive to this concern, the Court finds that a stay of the AGC proceeding is warranted to further an equally strong federal policy favoring arbitration. Plaintiff seeks to prevent the Tribe from stripping Plaintiff of its right to employ the contractual dispute resolution process, and simply asks the Court to preserve for decision by arbitrators the question of whether their dispute is arbitrable, as expressly provided by the arbitration agreement. Defendants, on the other hand, contend that the regulatory matter to be enjoined is not covered by the arbitration agreement and that an arbitrator has no authority over a tribal gaming matter. Defendants' argument begs the question of whether the dispute is arbitrable and, in the Court's view, demonstrates why Plaintiff needs the requested injunction. Without it, the AGC will proceed to determine one or more issues that the Tribe agreed to arbitrate.

Any contention that the AGC needs to proceed expeditiously to protect tribal interests and determine regulatory issues is undermined by the undisputed facts that the AGC allowed TGS's license to expire and delayed taking any action until the first arbitration hearing was imminent, that TGS has not been operating as a licensed gaming vendor since the summer of 2010, and that any penalty imposed by the AGC would simply seek to remedy a past violation. Defendants have not articulated any pressing reason why the AGC should be allowed to proceed before this case can be decided on the merits. Also, the Tribe's Petition for License Review challenges an assignment that

the AGC expressly approved in 2008. The parties reached a written agreement at that time as to the limits of tribal jurisdiction over Plaintiff. They expressly agreed at that time that the AGC would not assert jurisdiction over Wells Fargo with regard to the Equipment Lease and Assignment now at issue in the pending tribal proceeding. Under these circumstances, the Court finds that the balance of hardships between the parties tips in favor of granting Plaintiff's request for a preliminary injunction to stop the AGC from going forward, as set forth herein.

C.    Public Interest

For similar reasons, the Court also finds that a preliminary injunction is not contrary to the public interest. Defendants assert that the AGC's regulatory authority cannot be delegated to an arbitrator, and that enjoining a tribal regulatory matter to allow private arbitration of regulatory issues would be against the public's interest in respecting tribal sovereignty and promoting tribal self-governance. As discussed above, this argument assumes that the parties' dispute constitutes a tribal regulatory matter and that the AGC's proceeding as to Plaintiff involves regulatory issues, which are questions that Plaintiff seeks to have decided by arbitrators. As further discussed above with regard to the balance of interests, the Court finds that safeguarding an arbitration agreement made by the Tribe in 2008, the validity of which presently stands unchallenged in this case, best serves the public interest.

D.    Likelihood of Success on the Merits

Finally, to demonstrate a substantial likelihood of success on the merits of its claims against the officers of the AGC, Plaintiff is "required to present a prima facie case showing a reasonable probability that [it] will ultimately be entitled to the relief sought." *Salt Lake Tribune Pub. Co., LLC v. AT&T Corp.*, 320 F.3d 1081, 1100 (10th Cir. 2003) (internal quotation omitted). Under the modified preliminary injunction standard, Plaintiff needs only to show that questions going to the

merits of its claims "are so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation." *Greater Yellowstone*, 321 F.3d at 1255-56; *see O Centro*, 389 F.3d at 976. The Court has determined that this standard applies in this case, and upon consideration, the Court finds that Plaintiff has made a sufficient showing that its claims deserve more deliberate consideration. In fact, the Court believes that Plaintiff has gone further and made a strong showing of likely success on its claims against officers of the AGC.[14]

Plaintiff alleges, and has provided reliable evidence to show, that the issues as they relate to Plaintiff raised by the AGC in April, 2011, and now pending before it in the tribal proceeding initiated by the Tribe in June, 2011, do not constitute legitimate regulatory matters within the scope of the Tribe's authority to enforce its gaming laws and require compliance with IGRA. Instead, these issues appear to be part of a concerted effort by the Tribe to evade its contractual obligations. The issues to be decided in the tribal proceeding appear to be aimed at deciding the nature of the interest conveyed by the Assignment and whether approval by the National Indian Gaming Commission ("NIGC") was required. However, Defendants have pointed to no law or regulation that places these matters within the AGC's field of competence. The power to void a contract that required, but did not have, proper approval lies with the NIGC. *See* 25 U.S.C. § 2711(f); *see also United States ex rel. Saint Regis Mohawk Tribe v. President R.C.-St. Regis Management Co.*, 451 F.3d 44, 48 (2d Cir. 2006). The legal validity of a contract (as opposed to approval for compliance with IGRA and regulations) is "not within the scope of the administrative bodies" charged with implementing gaming laws. *See Bruce H. Lien Co. v. Three Affiliated Tribes*, 93 F.3d 1412, 1418

---

[14] Under the heightened standard, Plaintiff must make a "strong showing" of likely success. *See O Centro*, 389 F.3d at 975. If this standard applied, the Court would also find it to be satisfied.

(8th Cir. 1996). In short, the Petition for License Review pending before the AGC, and the hearing that its hearing officer seeks to hold, involve matters that are not covered by tribal gaming laws.

Further, the Court finds it to be no coincidence that the AGC issued its notice to Plaintiff, and that the Tribe authorized the remedy of disgorgement, shortly before the arbitration hearing between Plaintiff and the Tribe. Chairman Maynahonah candidly admitted that his pre-arbitration actions were designed to protect the Tribe from the possibility of an unfavorable arbitral ruling. While it is less clear that the AGC shared this purpose, the timing of events and the subsequent involvement of Chairman Maynahonah and the Business Committee in the AGC proceeding strongly suggest that the AGC's activities were similarly aimed at protecting the Tribe from contractual liability. More importantly, it appears that the Tribe's Petition for License Review as it relates to the Assignment involves a "claim" related to the Equipment Lease and governed by its arbitration agreement. If so, the question of whether this claim presents an arbitrable dispute is a matter to be decided by arbitration, and the AGC's assertion of authority to decide issues raised in the Petition is contrary to the Tribe's obligation under the arbitration agreement.

For these reasons, the Court finds that Plaintiff has shown a likelihood of success on the merits of its claim of an improper assertion of jurisdiction by the AGC in attempting to decide issues that are outside its area of regulatory authority and within the boundaries of the Tribe's arbitration agreement.

E.    Preliminary Injunction

In summary, the Court concludes that Plaintiff has satisfied its burden to show that the circumstances of the case warrant interim relief and that a preliminary injunction should issue to prevent the officers of the AGC from proceeding further to decide issues that fall outside the

boundaries of their regulatory authority. Accordingly, the Court will issue an injunction designed

solely to preserve those issues for decision by arbitration, as agreed by Plaintiff and the Tribe.

V.

Security

Pursuant to Fed. R. Civ. P. 65(c), the Court finds that the security previously posted by

Plaintiff in connection with the TRO in the amount of $5,000.00 is sufficient to secure the payment

of costs and attorney's fees likely to be incurred in connection with the preliminary injunction, if

it is later determined to have been improvidently issued. This case will be set for a scheduling

conference on the Court's next available docket.

**ORDER**

IT IS THEREFORE ORDERED that Plaintiff's Motion for a Preliminary Injunction [Doc.

No. 34] is GRANTED.

IT IS HEREBY ORDERED that, pursuant to Fed. R. Civ. P. 65, Defendants Gene Flute,

Ronald Ahtone, Jr., Austin Klinekole and Richard J. Grellner, as members or officers of the Apache

Gaming Commission, and any other persons who are in active concert or participation with these

defendants, are enjoined from proceeding with any hearing, issuing any order, making any

determination, or taking any official action with respect to issues raised by the Petition for License

Review filed by the Apache Tribe of Oklahoma, and included in the order issued by the Apache

Gaming Commission on July 14, 2011, except as expressly mandated by the Tribal Gaming

Ordinance. Specifically, this injunction applies to issues numbered 1 and 4, set forth in the July 14,

2011 order, and any other matter which seeks to adjudicate issues regarding Wells Fargo Bank or

affecting any of its rights or potential remedies under the Loan Agreement, Equipment Lease or

related documents.  This injunction shall remain in full force and effect until a final judgment is entered in this case, or until further order of the Court.

IT IS SO ORDERED this 2nd  day of September, 2011.

_____
TIMOTHY D. DeGIUSTI
UNITED STATES DISTRICT JUDGE